UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

SARAH SCHIAVONE and : 
MICKAYLA MEREDICK, as :
Administrators of the :
HAILEY POVISIL, :
 :
Plaintiffs, :
 : JURY TRIAL DEMANDED
v. :
 : NO.: 3:21-CV-1686
LUZERNE COUNTY, et al. :
 :
Defendants. :

AMENDED COMPLAINT

Plaintiffs, Sarah Schiavone and Mickayla Meredick, as the Administrators of the Estate of Hailey Povisil, by and through their attorneys, Barry H. Dyller, Esq., and Dyller & Solomon, LLC, for their Amended Complaint allege as follows:

JURISDICTION AND VENUE

1. This action arises out of violations of 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, and the Rehabilitation Act ("RA"), 29 U.S.C. § 701, *et seq*.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12133, and 42 U.S.C. § 794a(a)(2) incorporating 42 U.S.C. § 2000e-5. Venue is proper in this judicial district

1

under 28 U.S.C. § 1391(b) because all defendants reside in this State and some of the defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

3. At all relevant times, the plaintiff's decedent Hailey Povisil ("Ms. Povisil") was an adult residing in Luzerne County, Pennsylvania.

4. Defendant Luzerne County is a municipality in Pennsylvania and owns and controls Luzerne County Correctional Facility ("LCCF").

5. INTENTIONALLY OMITTED.

6. At all times relevant hereto, defendant Correct Care Solutions, LLC ("CCSLLC"), was the medical provider for LCCF.

7. At all times relevant hereto, defendant Wellpath, LLC, ("Wellpath"), was doing business as Correct Care Solutions, LLC ("CCSLLC"), and was the medical provider for LCCF. Wellpath and CCSLLC are referred to collectively herein as "CCS."

## BACKGROUND

Suicide Prevention Concerns or Lack Thereof at LCCF

8. In 2003, a consultant in suicide prevention in prisons or jails

provided an assessment of LCCF.

9. Upon information and belief, given the multiple female LCCF inmates who committed suicide in 2017 and into 2018, LCCF either did not implement recommendations by the suicide prevention consultant, or over time became lax in anti-suicide training and protocols.

10. In March of 2016, that same suicide prevention consultant released a new Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities (the "2016 Suicide Prevention Guide"). The 2016 Suicide Prevention Guide was considered the most comprehensive and up-to-date instruction on suicide prevention in correctional facilities. It contained more than 10 hours of instruction, a 187 page manual, and a CD with 218 PowerPoint slides.

11. The suicide prevention consultant offered the 2016 Suicide Prevention Guide to the Pennsylvania Department of Corrections.

12. On November 15, 2016, the suicide prevention specialist again offered 2016 Suicide Prevention Guide to the Pennsylvania Department of Corrections, and included several reviews from corrections officials who had used it.

13. Later on November 15, 2016, the Director of the Pennsylvania Department of Corrections, Office of County Inspections and Services,

emailed the necessary information to officials at all Pennsylvania county correctional facilities, including the LCCF, so each county could take advantage of this training in suicide prevention.

14. The Division Head of Correctional Services for LCCF ("LCCF Division Head"), is the person who makes Luzerne County prison policy.

15. The LCCF Division Head received the information about the 2016 Suicide Prevention Guide.

16. The LCCF Division Head then forwarded the information to Luzerne County's Treatment Coordinator.

17. In response to the LCCF Division Head's inquiry to Luzerne County's Treatment Coordinator, she responded that "I am not sure if a 10 hour training course would be best utilized, knowing already how much some officers feel about trainings." Luzerne County's Treatment Coordinator concluded "I would hate to see money wasted that way."

18. Luzerne County therefore did not obtain the 2016 Suicide Prevention Guide, and did not provide current training to its officers and employees.

19. Luzerne County thus made a deliberate choice not to "waste" its money on a comprehensive suicide prevention guide and training program because LCCF's officers do not like training.

CCS's Responsibilities at LCCF

20. On or around April 1, 2015, CCS and Luzerne County entered into a contract for CCS to provide various services for LCCF.

21. The services CCS was supposed to provide included arranging and bearing the cost of "receiving screenings" for inmate admittees within eight hours of booking, including review and approval by a physician or "physician extender"[1] within twenty-four hours; arranging and bearing the cost of on-site mental health services, including evaluations, referrals, crisis management, suicide intervention, individual therapy and group therapy; identifying to the LCCF Director of Corrections those inmates with medical or mental health conditions which may be worsened as a result of incarceration at LCCF.

22. The purpose of such a contractual provision was to permit CCS to provide as little care as possible to inmates without interference from Luzerne County, and to create the appearance that substandard inmate care was not the responsibility of Luzerne County.

23. Through their contract with each other, Luzerne County and CCS attempted to shift all responsibility and control over inmate health care

---

[1] Upon information and belief, a "physician extender" is a non-physician who does the work of a physician. A "physician extender" is thus a fiction to permit physician tasks to be performed by a lesser trained person.

5

away from Luzerne County and to CCS.

24. Despite contractual provisions discussed above which appear on their surface to include substantial mental health evaluation and treatment within the LCCF, both Luzerne County and CCS knew that sucha provision was false and was merely for show.

25. An exhibit to the contract provided that a psychiatrist would only be at the LCCF 8 hours per week. According to the exhibit, a psychiatrist would be available only on Tuesdays and Thursdays for 4 hours on each of those days. This is despite a large LCCF population ofmentally ill and/or addicted inmates.

26. Luzerne County knows that most inmates incarcerated at the LCCF have some form of addiction.  For many inmates, this addiction is to opiates.

27. Many inmates are brought into LCCF either under the influence of drugs or suffering the effects of recent withdrawal from drugs.

28. Even though many new inmates have addictions, the contract does not have any requirement for the qualifications of any person assigned to do "receiving screenings" of inmates.

29. The contract does not contain any provision with dealing with addiction or withdrawal issues involving inmates.  At the time of Ms. Povisil's

6

incarceration and death, neither Luzerne County nor CCS had any protocol for treating addicted inmates or inmates withdrawing from an addictive drug or substance.

Deaths of Female Inmates at LCCF in 2017

30. Soon after Luzerne County's November 2016 choice not to "waste" money on suicide prevention, there were multiple suicides by, or other deaths of, female inmates at the LCCF.

31. Upon information and belief, all the deaths referred to above, including suicides, were drug related.

32. Upon information and belief, the female inmates referred to above who committed suicide were withdrawing from drugs when they were incarcerated.

33. Defendants did not provide appropriate care or monitoring of inmates who were experiencing withdrawal, and some died from complications and some committed suicide.

34. On June 6, 2017, a female inmate named Brooke Griesing was booked into the LCCF. On June 8, 2018, Ms. Griesing died in the LCCF. The cause of death was "asphyxia due to hanging." The manner of death was "suicide." Ms. Griesing committed suicide with a bedsheet provided byLCCF.

35. Ms. Griesing had multiple drugs in her system at the time of her

7

death, including fentanyl.

36. On July 7, 2017, a female inmate named Joan Rosengrant died in the LCCF. According to the Certificate of Death, the "injury occurred" as the "Effects of Drugs."

37. On July 15, 2017, a female inmate named Tricia Cooper was admitted to LCCF. Upon information and belief, Ms. Cooper was a drug addict. On July 25, 2017, an inmate discovered Ms. Cooper inside her cell hanging from the bed ladder. Ms. Cooper was pronounced dead on July 31, 2017. The autopsy report stated that the cause of death was "Asphyxiadue to Hanging." The manner of death was reported as "Suicide."

38. These three deaths of female inmates in LCCF within a month and a half all appear to be drug related. Two of the deaths were suicides.

39. Yet, upon information and belief, neither LCCF, Luzerne County, Wellpath nor CCS undertook any investigation to determine why so many female LCCF inmates were dying from drug related issues and suicide.

40. This absence of investigation or remedial action was destined to permit further female inmates to die from drug and/or suicide related causes.

41. This indifference to underlying causes of deaths by female LCCF inmates was a cause of Hailey Povisil's subsequent death in LCCF on January 9, 2018, less than six months after Tricia Cooper's death in

LCCF.

### Luzerne County's and CCS's Policies and Customs Concerning Inmate Suicide

42.     Luzerne County's and CCS's policies and customs concerning inmate suicide were unconstitutional, in that the policy and custom was that anti-suicide policies and training were a waste of time and money.

43.     Luzerne County's and CCS's policies and customs concerning mental health and psychiatric care were that there was a vastly inadequate amount of such care available, and despite suicide risks and other serious mental health needs, Luzerne County and CCS would only contract or provide for limited care and limited hours of service. Therefore, policy dictated a waiting list for urgent mental health care.

44.     Luzerne County's and CCS's policies and customs concerning addicted inmates or inmates suffering from withdrawal symptoms were unconstitutional, in that despite their knowledge that the majority of LCCF inmates have some form of addiction, they chose not to have policies or protocols to ease the suffering of such addicted inmates, or to have any requirements for treating such inmates' addictions or withdrawal symptoms.

45.     Luzerne County's and CCS's policies and customs concerning inmate suicide were unconstitutional, in that despite repeated suicides and

related deaths by LCCF's limited female inmate population, such untimely deaths were a simple fact of life which did not require investigation, assessment or prevention of future inmate deaths.

Hailey Povisil's Incarceration and Death

46. On Saturday January 6, 2018, decedent Hailey Povisil was incarcerated in the LCCF.[2]

47. Ms. Povisil was addicted to drugs. Ms. Povisil indicated that she had used heroin one hour prior to her arrest.

48. Ms. Povisil indicated that she used 35 bags of heroin every day.

49. Luzerne County's and CCS's records reveal that the amount of heroin Ms. Povisil used daily had steadily increased in one year. It went from 15-20 bags of heroin daily in January 2017, to 20 bags daily in June 2017, to 25-30 bags daily in October 2017, to 35 bags daily as of January 6, 2018. In other words, Luzerne County's and CCS's records revealed that Ms. Povisil's daily heroin use had doubled in one year.

50. During the short time Ms. Povisil was in LCCF before committing suicide, she was withdrawing from her heroin addiction.

51. Ms. Povisil soiled herself. Neither LCCF staff nor CCS staff

---

[2] While she did have problems including mental health and addiction problems, Ms. Povisil was more than just a name or a statistic. Attached hereto as an exhibit is Ms. Povisil's booking photo, so the Court or reader can put a face to a name.

10

chose to document this.

52. Ms. Povisil vomited. Neither LCCF staff nor CCS staff chose to document this.

53. Ms. Povisil's clothes and blanket were soiled and vomited on. Despite this and LCCF staff knowledge of it, LCCF staff did not help Ms. Povisil by getting new clothes or a new blanket for her. Ms. Povisil was forced to try to keep warm by wrapping her mattress around herself.

54. Ms. Povisil also had severe mental health issues. Defendants CCS and Luzerne County knew that Ms. Povisil had previously been diagnosed as bipolar, with depression and anxiety.

55. CCS's and Luzerne County's records reveal that they knew that Ms. Povisil had been hospitalized for her mental illnesses at least five times in the previous six to seven years.

56. CCS's and Luzerne County's records reveal that they knew that Ms. Povisil had been contemplating suicide less than a year prior to her January 6, 2018 incarceration.

57. CCS and Luzerne County also knew that Ms. Povisil had been a victim of sexual abuse or rape.

58. CCS assessed Ms. Povisil's need for a mental health referral as "urgent." But CCS did not follow up and provide the mental health referral or

treatment.

59. Upon admission to LCCF, Ms. Povisil was placed on a suicide watch.

60. On January 9, 2019, Ms. Povisil begged for help because she was suffering withdrawal effects from addictive drugs.

61. Upon information and belief, a Luzerne County correctional officer chose not to help Ms. Povisil, and not to contact a medical or psychiatric professional to help Ms. Povisil.

62. INTENTIONALLY LEFT BLANK.

63. On January 9, 2018, only three days after her admission to LCCF and placement on suicide watch, and while still detoxing from heroin, CCS removed Ms. Povisil from suicide watch.

64. Eight hours later, Ms. Povisil's body was found. She had committed suicide.

65. On January 9, 2018, Ms. Povisil, like Ms. Griesing and Ms. Cooper before her, committed suicide within LCCF by hanging herself with the sheet LCCF had provided to her and which Luzerne County knew from previous suicides was an implement of suicide.

66. Only **after** Ms. Povisil's death – the fourth female LCCF inmate death in less than eight months -- did any defendant decide to review

policies and procedures at LCCF.

67.	Only **after** Ms. Povisil's death did Luzerne County consider that it might be a good idea to assess why multiple female LCCF inmates were taking their own lives or dying from otherwise preventable causes. And Luzerne County only considered such an assessment due to fear of litigation, as evidenced by the involvement of Luzerne County's litigation attorney.

68.	Prior to Ms. Povisil's death, neither Luzerne County nor CCS made any self-assessment of what they were doing wrong that was causing or permitting so many female inmates to die, and whether the deaths related to their responsibilities to care for the inmates' health.

69.	Consistent with Luzerne County's custom of a lax attitude about suicide prevention is that inmates are assigned to monitor suicidal inmates, but the inmates assigned to monitor are reprimanded if they report concerns to Luzerne County correctional staff.

70.	Due to Luzerne County's custom of a lax attitude about suicide prevention and reprimands or misconducts to inmate monitors who report concerns to LCCF staff, the inmate monitors frequently do not monitor. Instead of monitoring, they engage in their own pursuits, such as doing each other's hair.

71. Consistent with Luzerne County's custom of a lax attitude about training on suicide prevention and emphasis to its security staff about the importance of suicide prevention and doing of rounds to check on inmates at least every 15 minutes, Luzerne County's correctional officers did not do rounds for several hours, during which Ms. Povisil fashioned a sheet into a noose and committed suicide.

72. Correctional officers did not even find Ms. Povisil's dead body. Inmates found her hanging body and screamed for help.

73. Had Luzerne County or CCS decided to engage in proper policies and training when the suicide expert offered it, or after the 2017 suicides and deaths of three female inmates in LCCF, Ms. Povisil would be alive today.

## FIRST CLAIM FOR RELIEF
(42 U.S.C. § 1983)

74. Plaintiffs repeat and reallege each and every allegation contained above as if fully repeated herein.

75. Opioid use disorder is a chronic brain disease with potentially deadly implications.

76. Acute withdrawal is extremely painful and carries a heightened risk for numerous serious medical conditions, including an elevated risk of overdose and death.

77. Opioid use disorder and acute withdrawal from opioids are conditions that require appropriate medical treatment, including but not limited to the timely administration of medically necessary drugs.

78. Defendants chose to leave Hailey Povisil suffering without appropriate medication for her entire time in LCCF. Because appropriate medication was not provided to Ms. Povisil in a timely fashion, she chose to end her own life to stop the unbearable pain she was feeling.

79. The defendants, acting under color of state law, deliberately, purposefully, and knowingly denied Ms. Povisil timely access to necessary medical treatment for her opioid use disorder, which is a serious medical need.

80. Luzerne County's and CCS's conduct constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution. In addition, such conduct constituted a deprivation of Ms. Povisil's Due Process rights under the Fourteenth Amendment to the United States Constitution.

81. Defendants' conduct therefore was a deprivation, under color of state law, of rights guaranteed to Ms. Povisil under the Eighth and Fourteenth Amendments to the United States Constitution.

82. As a result of defendants' violations of Ms. Povisil's Constitutional rights, Ms. Povisil suffered substantial injuries and damage.

## SECOND CLAIM FOR RELIEF[3]
(Americans with Disabilities Act ("ADA"))

83. Plaintiffs repeat and reallege each and every allegation contained above as if fully repeated herein.

84. Ms. Povisil was disabled within the meaning of the ADA because she was suicidal, because she had severe mental health issues and because she was addicted to opiates.

85. Drug addiction is a disability under the ADA and RA.

86. Defendants denied Ms. Povisil the benefits of LCCF's and CCS/Wellpath's medical programs on the basis of her disability.

87. Defendants' choice not to provide Ms. Povisil with reasonable accommodations for her disability constituted discrimination against her on the basis of her disability.

88. Upon information and belief, defendants do not fail to timely administer medically necessary medications to other inmates with serious, chronic medical conditions, such as diabetes.

89. Defendants knew of Ms. Povisil's disabilities.

---

[3] All facts necessary for stating a claim for violation of the Americans With Disabilities Act ("ADA") and Rehabilitation Act ("RA") were pled in the original complaint. Therefore, ADA and RA claims were pled in the original complaint. See *Johnson v. City of Shelby*, 574 U.S. 10 (2014) (only facts, not legal theories, need be pled in a complaint). This Amended Complaint clarifies that ADA and RA claims are also pled.

16

90. In addition, Ms. Povisil was regarded as disabled by defendants by virtue of their knowledge of her addiction, her withdrawal, her suicidality and her mental health issues discussed above.

91. Reasonable accommodations for suicidal individuals who are opiate addicts and who are going through withdrawal include but are not limited to keeping a close watch on them for more than three days and certainly during the entire time they are withdrawing from opiates; timely providing medications to calm them and mitigate the effects of withdrawal; providing clean clothes and suicide-proof items to keep warm; and making an affirmative determination that the person is not currently suicidal.

92. Instead of making these reasonable accommodations, defendants did not provide Ms. Povisil with mental health care; did not provide her with clean clothing or items to keep warm; did not assess whether Ms. Povisil was currently suicidal; and released Ms. Povisil to the general population of the jail after only three days and while Ms. Povisil was still withdrawing from her opiate addiction.

93. Despite knowing of the obvious risk that addicted, suicidal and mentally ill persons would commit suicide, defendants did not provide accommodations as discussed above, and instead released and authorized the release of Ms. Povisil to general population of the LCCF, where observation was limited and opportunities for suicide were widely available.

94. Defendants Luzerne County and CCS/Wellpath therefore acted with deliberate indifference to the risk of suicide that Ms. Povisil faced.

95. As a result of defendants' violation of the ADA, Ms. Povisil committed suicide.

## COUNT THREE
(Rehabilitation Act "RA")

96. Plaintiffs repeat and reallege each and every allegation made above as if fully repeated herein.

97. Luzerne County and, upon information and belief, CCS/Wellpath, are entities that receive federal funding.

98. Defendants' actions and inactions as described above violate the Rehabilitation Act.

99. As a result of defendants' violation of the RA, Ms. Povisil committed suicide.

WHEREFORE, plaintiffs demand judgment as follows:

A. As to defendant Luzerne County, an amount to be determinedat trial, plus interest;

B. As to defendants Wellpath, LLC and/or Correct Care Solutions, LLC, an amount to be determined at trial, including punitive damages against each of them, plus interest;

C. For plaintiffs' attorneys' fees, pursuant to 42 U.S.C. § 1988;

D. For the costs and disbursements incurred in this action; and

E. For such other and further relief as the Court deems just and proper.

DYLLER & SOLOMON, LLC

/s/ Barry H. Dyller, Esq.
Attorneys for Plaintiffs
Gettysburg House
88 North Franklin Street
Wilkes-Barre, PA  18701
(570) 829-4860

## JURY DEMAND

Plaintiffs demand a trial by jury.